Mary **FATH**, Plaintiff,

v.

**UNUM LIFE INSURANCE COMPANY OF AMERICA**, Defendant.

No. 95–404–CIV–T–17E.

United States District Court, M.D. Florida, Tampa Division.

June 10, 1996.

---

Eric E. Ludin, Piper & Ludin, St. Petersburg, FL, for plaintiff.

Jay S. Blumenkopf, Jonathan M. Fordin, Proskauer, Rose, Goetz & Mendelsohn LLP, Boca Raton, FL, for defendant.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

KOVACHEVICH, Chief Judge.

This action is before the Court on the following motions, cross-motions, and responses:

1. Plaintiff, MARY FATH's ("Fath"), motion for summary judgment (Docket No. 28) filed on February 27, 1996.

2. Defendant, UNUM LIFE INSURANCE COMPANY OF AMERICA's ("UNUM"), response thereto and cross-motion for summary judgment (Docket No. 31) filed on March 15, 1996.

3. Plaintiff, FATH's, response thereto (Docket No. 36) filed on March 29, 1996.

## FACTS

Defendant UNUM Life Insurance Company of America issued a group disability policy to Garteck Technologies, Inc. ("Garteck"). This Select Group Insurance Trust provided disability coverage for Plaintiff, Garteck's employee and part owner—Mary Fath, with an effective coverage date of February 1, 1991. The policy issued by Defendant contained an exclusion of coverage for pre-existing conditions which were defined as "... a sickness or injury for which [she] received (1) medical treatment, consultation, care or services including diagnostic measures, or (2) had taken prescribed drugs or medicines in the twenty-four (24) months prior to [the] effective date." (Plaintiff's Affidavit, Docket #30, Long Term Disability Income Plan, Page 11). If a pre-existing condition exists, the policy precludes coverage of "... any disability that is caused by, contributed to by, or results from a pre-existing condition. But, that disability will be covered if it begins after a period of twelve (12) consecutive months starting on or after [the] effective date of coverage ..." (Id.). Plaintiff was covered under this disability insurance policy.

The evidence submitted in support of the cross motions for summary judgment establishes the following facts. Plaintiff has a long history of neck and back pain and walking difficulties. As an adolescent, Plaintiff was diagnosed with scoliosis. In 1972, 1973, and 1985 Plaintiff was involved in three (3) car accidents resulting in neck and back injuries. After each incident, Plaintiff sought chiropractic care. In 1982, Plaintiff began seeing Dr. James O'Neill, a chiropractor, for back and leg pain during her pregnancy. From February 1985 through February 1986 Plaintiff collected salary compensation from her employer while she was unable to work due to back and neck pain and walking difficulties associated with prolonged sitting and keyboard use. During that time, Plaintiff again received chiropractic care from Dr. O'Neill. Plaintiff has continued to receive chiropractic treatment with Dr. O'Neill over the last thirteen (13) years.

Plaintiff concedes that during the twenty-four (24) months prior to the effective date of the policy, she received three (3) separate chiropractic treatments from Dr. O'Neill on November 6 and 8, 1989, and April 2, 1990. Plaintiff claims these treatments were for general health maintenance and not to treat a specific problem.

In December 1992, less than two (2) years after activation of her disability policy, Plaintiff began experiencing increased neck, back, knee, and wrist pain and walking difficulties after falling at home. During this time, Plaintiff received chiropractic adjustments from Dr. O'Neill. March 12, 1993, Plaintiff was referred to Dr. Kamat M.D., a neurologist. On May 21, 1993, Dr. Kamat reported that Plaintiff suffered from irritation to the nerve roots and pain from hypermobility (overflexibility) of the joints noting Plaintiff's inability to sit in one position for any length of time.

In November 1993, Plaintiff was referred to Dr. Spuza–Milord M.D., rheumatologist, who diagnosed Plaintiff as having Fibromyalgia, a chronic inflammation of the muscle sheath located in her back, neck, and legs which causes ill-defined joint pain. Dr. Spuza–Milord also suspected Plaintiff had Ehlers–Danlos Syndrome due to abnormal hyperextension of Plaintiff's joints and recommended further testing. On April 8, 1994, Dr. Spuza–Milord reported that Plaintiff was to restrict sitting to one to two hours per day and standing to less than one hour per day due to joint hyperlaxity and associated joint pain.

Next, Plaintiff was referred to Dr. Dunne M.D., a neurologist who also diagnosed Plaintiff as having Fibromyalgia along with scoliosis. On September 26, 1994, Plaintiff was tested on her physical capacities at Edward White Hospital at which time Dr. Spuza–Milord's diagnosis was re-affirmed.

On October 18, 1994, Plaintiff was referred to Dr. Kousseff M.D., genetic specialist, who diagnosed Plaintiff with Ehlers–Danlos Syndrome Type III ("EDS"). EDS is a hereditary congenital disease that progressively weakens connective tissue and causes joints to become loose and sublux or dislocate easily. Dr. Kousseff noted Plaintiff's history of lax joints and scoliosis which is frequently found in individuals with EDS. Dr. Kousseff believed that Plaintiff had suffered from EDS all along, and determined that EDS was the probable cause of Plaintiff's Fibromyalgia joint pain. For treatment, Dr. Kousseff recommended rehabiliatory exercises and allowed Plaintiff to continue treatment with Dr. O'Neill for chiropractic adjustments to stabilize her hyperlaxity joint condition.

After review of Dr. Kousseff's diagnosis, Dr. O'Neill, Dr. Kamat, Dr. Dunne and Dr. Spuza–Milord now agree that Plaintiff suffers from EDS and Fibromyalgia.

Throughout Plaintiff's numerous diagnoses and treatments, she filed five (5) separate disability claims with Defendant. In her April 1994 claim, Plaintiff describes her disability as laxity of most joints combined with chronic pain throughout the muscles, ligaments, and tendons caused by Fibromyalgia. As a result of this condition, Plaintiff claims she is unable to sit and use a keyboard for extended periods of time resulting in a total inability to perform as a computer programmer with Garteck. Based on this condition, Plaintiff claims entitlement to disability benefits from Defendant. In response, from October 12, 1993 to July 29, 1994, Defendant denied all five (5) claims by Plaintiff for disability benefits based on lack of medical proof of disability and lack of total disability.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as matter of law." Fed.R.Civ.P. 56(c). Summary judgment should only be entered when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact when all the evidence is viewed in the light most favorable to the non-moving party. *Sweat v. Miller Brewing Co.,* 708 F.2d 655 (11th Cir.1983). Issues of fact are " 'genuine' only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). The Supreme Court further mandates that "Rule 56(e) . . . requires that the non-moving party go beyond the pleadings and by his or her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that

there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## DISCUSSION

■ The Court has considered Plaintiff's motion for summary judgment, Defendant's response thereto and cross motion for summary judgment, and Plaintiff's response thereto, and all supporting documentation. Although the Court must view the evidence in the light most favorable to the non-moving party, the Court is mindful of the standard of proof necessary for Plaintiff to establish the existence of a genuine issue of material fact. As required by the Supreme Court in *Celotex Corp.* Plaintiff has gone beyond the pleadings and has attempted to establish a factual question through the depositions of her various treating physicians. However, Plaintiff's treating physicians, and own deposition, indicate that symptoms and treatment for Ehlers–Danlos Syndrome and Fibromyalgia occurred during the twenty-four (24) month period prior to the activation of her medical disability policy.

In response to Defendant's motion for summary judgment, Plaintiff argues that she never experience symptoms of EDS until 1993 and was not formally diagnosed with EDS until 1994. But, regardless of whether the symptoms of EDS existed prior to the effective date of the policy, Plaintiff argues that she did not receive treatment for EDS until after the requisite twenty-four (24) month period. As a result, Plaintiff contends that her condition does not qualify as "pre-existing" under Defendant's policy and therefore, she should receive disability benefits for her present inability to work as a computer programmer.

First, Plaintiff alleges that she never experienced symptoms of Ehlers–Danlos Syndrome and Fibromyalgia prior to the effective date of the policy. However, in *Winchester v. Prudential Life Insurance Co. of America,* 975 F.2d 1479, 1488 (10th Cir.1992) a summary judgment was affirmed due to the non-moving party's failure to prove by a preponderance of the evidence that the insured's condition was not pre-existing. The Winchester court's holding was based on the finding that the appellant's own evidence indicated it was more likely than not that the condition was pre-existing. Plaintiff's treating physicians, and own deposition, in this action presents a similar situation.

The deposition of Plaintiff's diagnosing doctor, Dr. Kousseff (offered as Defendant's Exhibit 9), indicates that it is more likely than not that the Plaintiff's condition existed prior to the commencement of the insurance policy on February 1, 1991. Specifically, Dr. Kousseff defines Ehlers–Danlos Syndrome as a hereditary congenital problem with the connective tissue which causes other ill-defined complaints including Fibromyalgia. (Defendant's Exhibit # 9, Page 53, Lines 6–10). Dr. Kousseff noted Plaintiff's history for lax joints and scoliosis as a teenager which are frequently found in individuals with EDS connective tissue problems. (Exhibit # 9, Page 16, Lines 12–15; Page 24, Lines 15–19). Dr. Kousseff concluded that the EDS connective tissue weakness has been with Plaintiff all along. (Exhibit # 9, Page 34, Lines 21–23).

In addition to Dr. Kousseff's deposition, Plaintiff has reported a history of walking difficulties, in fact, she currently uses a cane for stability. Dr. Spuza–Milord indicated during her deposition, that this difficulty is caused by ligament instability due to EDS muscle deterioration. (Plaintiff's Exhibit # 7, Pages 63–64, Lines 18–2). During her pregnancy in 1982, Plaintiff complained of leg and back pain coupled with numbness during her preliminary visit with Dr. O'Neill. (Defendant's Exhibit # 7). According to an Ehlers–Danlos Medical Study, women with EDS experience increased joint laxity during pregnancy, to the point that many of these women could not walk while pregnant. (Defendant's Exhibit # 9, "A Survey Of Patients With Ehlers–Danlos Syndrome", Page 3). During this same office visit, Plaintiff specifically described the diagnosis of her complaint as "scoliosis, ... congenital malformations, degeneration of bones and muscles." (Defendant's Exhibit # 7).

Plaintiff has also complained of chronic back and neck pain associated with sitting difficulties since 1985. Plaintiff worked for

Silor Optical as a computer programmer from 1982 through 1985. From 1985 through 1986, Plaintiff received disability benefits due to her inability to sit and work on the keyboard because of neck and back pain. (Defendant's Exhibit # 1, Page 34–35). Again in 1993, Plaintiff quit her job as a computer programmer with Garteck due to increased back and neck pain from prolonged sitting and keyboard use. (Exhibit # 1, Page 40, Lines 15–17). These self-reported symptoms, repetitive complaints of pain, and numerous professional diagnoses by Plaintiff's doctors indisputably prove the manifestation of EDS and Fibromyalgia prior to the effective date of the policy.

 Next, Plaintiff argues that because she was not formally diagnosed with Fibromyalgia until 1993 and Ehlers–Danlos Syndrome until 1994, there was no possibility she could have received medical treatment for these conditions twenty-four (24) months prior to the effective date of the policy. Courts interpreting similar clauses excluding pre-existing conditions from coverage have consistently held that a diagnosis of the condition prior to the effective date of the policy is not required in order for the exclusion to apply. *Kirk v. Provident Life and Accident Insurance Co.*, 942 F.2d 504, 506 (8th Cir. 1991) (coverage denied where symptoms were present prior to the effective date of policy but were insufficient to allow an accurate diagnosis at that time). Instead, the Court looks strictly to the plain language of the pre-existing policy to determine if a diagnosis requirement exists. *McCorkle v. Life General Security Ins. Co.*, 830 F.Supp. 1446 (M.D.Fla.1993) (absence of recorded diagnosis of illness prior to commencement of policy is irrelevant in determining applicability of pre-existing condition exclusion).

 Upon examination of Defendant's disability policy, the Court can find no language indicating a prerequisite of diagnosis for the exclusion to apply. Therefore, formal diagnosis of Plaintiff's condition after the effective date of the policy, is irrelevant in this situation in determining whether the pre-existing condition exclusion is met.

Summary judgment would clearly be granted based on case precedent if the exclusion in Defendant's policy only required manifestation of symptoms during the pre-policy time period to qualify as a pre-existing condition. However, Defendant's policy goes one step further to require that Plaintiff had to receive either medical treatment, consultation, care or services including diagnostic measures for a sickness or injury in the twenty-four (24) months prior to the effective date of the policy. Therefore, the crux of this case rests on whether Plaintiff's chiropractic treatments during the twenty-four (24) months prior to the effective date of the policy meet Defendant's policy exclusion for a pre-existing condition.

Plaintiff argues that, although she had been receiving chiropractic care from Dr. O'Neill since 1982 for back, neck, and leg pain, she never specifically received medical treatment for symptoms of EDS or Fibromyalgia within twenty-four (24) months prior to her disability date. Instead, Plaintiff considers her November 6 and 8, 1989 and April 2, 1990, chiropractic adjustments at Dr. O'Neill's office as general health maintenance versus treatment for a specific problem.

Initially, the Court looks to the plain language of Defendant's policy which defines a pre-existing condition as "... a sickness or injury for which [Plaintiff] received medical treatment, consultation, care or services ... in the twenty-four months prior to [the] effective date." (Plaintiff's Affidavit, Docket # 30, Long Term Disability Plan, Page 11). Therefore, if Plaintiff received any medical care or treatment for the symptoms of EDS and Fibromyalgia, including loose joints, dislocation or subluxation, or joint pain between February 1989 and February 1991, then her condition is pre-existing and she would be barred from disability benefits.

Next, the Court reviews Plaintiff's medical history, treating physicians' depositions, medical notes and studies, and her testimony to determine if she received the chiropractic adjustments to treat symptoms of EDS and Fibromyalgia. The first factor is Plaintiff's medical treatments since the start of her

chronic neck and back pain and walking difficulties which is as follows:

| | |
|---|---|
| 1972 | Back and neck injuries resulting from an automobile accident<br>Treatment: CHIROPRACTIC CARE |
| 1973 | Neck injury resulting from an automobile accident<br>Treatment: CHIROPRACTIC CARE |
| 1982 | Back and leg pain and numbness during pregnancy<br>Treatment: CHIROPRACTIC CARE |
| 1985 | Neck and back injury resulting from an automobile accident<br>Treatment: CHIROPRACTIC CARE |
| 1985 | Physical stress during pregnancy<br>Treatment: CHIROPRACTIC CARE |
| 1985–1986 | Neck and back pain associated with occupation (sitting, keyboard work)<br>Treatment: CHIROPRACTIC CARE |
| 1989 | General health maintenance as reported by Plaintiff<br>Treatment: CHIROPRACTIC CARE |
| 1990 | General health maintenance as reported by Plaintiff<br>Treatment: CHIROPRACTIC CARE |
| 1992 | Neck, back, knees, and wrist injury resulting from a fall at home<br>Treatment: CHIROPRACTIC CARE |
| 1993–Present | Increased neck and back pain associated with sitting; walking difficulty<br>Treatment: CHIROPRACTIC CARE |

From this list, it becomes clear that Plaintiff underwent chiropractic adjustments when she suffered from pain, particularly in her neck and back. Other than the three (3) visits between November 1989 and April 1990, at no time did Plaintiff receive chiropractic adjustment for "general health maintenance." Plaintiff's own affidavit is the only evidence provided to show that those three (3) treatments were for general health maintenance.

Second, Dr. Kousseff stated that EDS patients, like Plaintiff, experience habitual dislocation of joints due to loose muscles and tendons caused by this degenerative disease. (Defendant's Exhibit # 9, Pages 52–54). Dr. Kousseff concluded that the thirteen (13) years of chiropractic care by Dr. O'Neill have stabilized Plaintiff throughout the onset of EDS (Exhibit # 9, Page 64, Lines 6–9).

Plaintiff's chiropractor, Dr. O'Neill, stated in his deposition that Plaintiff ". . . has been experiencing difficulties, which in retrospect can be attributed to the onset of this problem (EDS), for several years." (Defendant's Exhibit # 8). Dr. O'Neill has treated Plaintiff's inability to stand and move due to instability of the vertebrae and joints (symptoms of EDS) since November 1988. (*Id.*) Dr. O'Neill reports that Plaintiff has continued to experience subluxation (minor dislocations) due to ligament instability which will precipitate as time progresses. (*Id.*) And, any injury to Plaintiff's back, neck, legs, etc. further accelerates the progress of EDS. (*Id.*)

Third, Plaintiff stated during deposition that chiropractic adjustment is the only treatment that is available to her for EDS, aside from rehabiliatory exercises which occasionally cause joint dislocation (Exhibit # 1, Page 57, Lines 7–10). Plaintiff further testified that she currently receives treatment from Dr. O'Neill for back and neck pain on an as-needed basis, once or twice a month. (Defendant's Exhibit # 1, Pages 56–57, Lines 20–6). This point leads to the final factor to be considered—the frequency of Plaintiff's visits to Dr. O'Neill in 1989.

The Plaintiff's past pattern of chiropractic treatment is once every few months. Once Plaintiff was diagnosed with EDS and Fibromyalgia, her treatments increased to once or twice a month as needed. (Defendant's Exhibit # 1, Page 56–57, Lines 20–6). The principal reason for Plaintiff's appointments with the chiropractor, past and present, have been for treatment of pain. Plaintiff received chiropractic adjustments on November 6 and 8, 1989, only one (1) day apart. The logical conclusion for the frequency of visits on November 6 and 8, 1989, is treatment for pain, not general health maintenance.

Plaintiff has attempted to circumvent the policy exclusion by asserting that her chiropractic adjustments in November 1989 and April 1990, were for general health maintenance. However, Plaintiff's past chiropractic history, frequency of chiropractic adjustments in November 1989, treating physicians' depositions, even Plaintiff's own testimony overwhelmingly substantiates that Plaintiff received treatment for the symptoms of EDS and Fibromyalgia during the twenty-four (24) month period prior to the effective date of the policy. Therefore, Plaintiff is not entitled to disability benefits under the plain language of Defendant's policy because Plaintiff's symptoms and subsequent treatment qualify under the pre-existing condition exclusion.

As indicated by the court in *Fischman v. Blue Cross & Blue Shield of Connecticut, Inc.*, 775 F.Supp. 513, 516 (D.Conn.1991), the rationale for the holdings in these cases is not only the plain language of the policies, but is also to prevent fraudulent attempts to receive coverage for known, undisclosed pre-existing conditions. The court in *Fischman* succinctly opined that "... coverage should not turn on whether the physician suspected a number of different ailments or had reached a conclusive diagnosis." *Id.* at 516. The clear reasoning for this is the difficulty that the insurer would face in attempting to determine whether that line is crossed before or after the effective date of coverage. Accordingly, it is

**ORDERED** that the Defendant's motion for summary judgment be **granted** and the Plaintiff's motion for summary judgment be **denied.** The Clerk of the Court is directed to enter a final judgment of dismissal in favor of the Defendant.

**DONE and ORDERED.**