**Donna PUGH, Plaintiff,**

v.

**AIG LIFE INSURANCE CO., American International Life Insurance Co. of New York, American Home Assurance Co., and National Fire Insurance Company of Pittsburgh, Pa., Defendants.**

**No. 6:96cv00135.**

United States District Court,
M.D. North Carolina.
Winston–Salem Division.

Oct. 16, 1998.

Randolph M. James, P.C., Randolph M. James, Winston–Salem, NC, for plaintiffs.

Joseph W. Moss, Moss and Mason, Greensboro, NC, for defendants.

## MEMORANDUM OPINION

BEATY, District Judge.

This matter comes before the Court on a Motion for Summary Judgment filed by Defendants on September 9, 1997 [Document # 45] on the grounds that the pleadings, depositions, answers to interrogatories, admissions of record, and affidavits show that there is no genuine issue as to any material fact and that Defendants are entitled to a judgment as a matter of law. After careful consideration of the forecast of evidence to be presented by both Plaintiff and Defendants, the Court will, for the reasons stated herein, grant Defendants' Motion for Summary Judgment.

## I. FACTUAL BACKGROUND

Plaintiff brings this claim pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq., to recover Permanent Total Disability benefits under her employer's group insurance plan. Plaintiff suffers from fibromyalgia, fatigue, and depression. (Am.Compl.¶ 11, 13.) As a result, she has been unable to work since January 1, 1995. (Am.Compl.¶ 2, 11.) Plaintiff underwent breast augmentation surgery in August of 1985, and when her breast implants were removed on February 1, 1995, they were determined to have ruptured. (Am. Compl.¶ 2, 11.)

AIG Life Insurance Company ("AIG") provided a group insurance plan to U.S. Air, Plaintiff's employer.[1] (Am.Compl.¶ 2.)

---

1. Plaintiff has sued the other Defendants captioned in this case based on the assertion that they "underwrite and administer" the Plan. (Am.Compl.¶ 3.) Defendants concede that AIG Life Insurance Company is the company that provided the policy and is the proper Defendant in this case. Therefore, future references to "Defendant" in this Memorandum

AIG denied Plaintiff's claim for disability benefits because they contend that Plaintiff's disability was not the result of an accident within the requisite time frame, and because the disability was substantially caused by a pre-existing condition. The group insurance plan is governed by ERISA, and Plaintiff brought her claim in this Court pursuant to ERISA's provision allowing an employee to bring a civil action "to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B).

## II. STANDARD OF REVIEW

■ For a claim brought pursuant to ERISA, a Plan Administrator's decision to deny benefits will be reviewed using a *de novo* standard of review, unless the employee benefit plan gives discretion to an administrator or fiduciary to determine benefits. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80, 95 (1989). Since neither party in the present case has suggested that Plaintiff's policy gave discretion to the administrator, this Court will undertake a *de novo* review of the decision to deny Plaintiff's claims. In undertaking this review, this Court will use rules of federal common law, as well as general principles of contract law and insurance law that do not conflict with the purposes of ERISA, in order to determine the parties' rights and obligations and to resolve disputes arising from the ERISA-regulated plan. *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 55–57, 107 S.Ct. 1549, 95 L.Ed.2d 39, 52–54 (1987); *Jenkins v. Montgomery Indus., Inc.,* 77 F.3d 740, 743–44 (4th Cir. 1996).

Based upon this *de novo* standard, the Court has considered all of the medical evidence previously considered by the Plan Administrator which resulted in a denial of Plaintiff's claim for benefits under the acci-

dental injury insurance plan involved in this case.[2] To the extent that a discussion of the facts is necessary to a consideration of the question presented by Defendants' Motion for Summary Judgment, the Court will recall the facts as a part of its analysis of the issues presented.

The analysis to be used under ERISA to review an accidental injury and disability determination by a Plan Administrator was explained by the Fourth Circuit Court of Appeals in the case of *Quesinberry v. Life Ins. Co. of N. Am.,* 987 F.2d 1017, 1028 (4th Cir.1993) (en banc). In *Quesinberry,* the Court relied upon the earlier Fourth Circuit case of *Adkins v. Reliance Standard Life Ins. Co.,* 917 F.2d 794 (4th Cir.1990), to address the similar question presented to this Court of "whether a particular loss was covered under an ERISA-governed accidental injury insurance policy." *Quesinberry,* 987 F.2d at 1028. The policy language in the instant case, as well as in *Quesinberry* and *Reliance Standard,* required that the injury result "directly and independently of all other causes." *Id.* The Court in *Quesinberry* stated that the *Reliance Standard* "test requires a two-step determination: first, whether there is a pre-existing disease, pre-disposition, or susceptibility to injury; and, second, whether this pre-existing condition, pre-disposition, or susceptibility substantially contributed to the disability or loss." *Id.* In both *Quesinberry* and *Reliance Standard* there was no dispute about the existence of an accidental injury which led to the two-step analysis under the *Reliance Standard* test. Because of the dispute between the parties in the present case, this Court must begin first with the question of whether there was an accident which precipitates coverage under an accidental injury insurance policy. After making this determination, the Court will then

Opinion are references to Defendant AIG Life Insurance Company.

**2.** This Court also considered additional evidence and documents obtained by the parties

during discovery where necessary for an adequate review of the administrator's decision. *See Quesinberry v. Life Ins. Co. of N. Am.,* 987 F.2d 1017, 1021–27 (4th Cir.1993) (en banc).

apply the two-step *Reliance Standard* test to determine if Plaintiff's disability is covered by the Plan.

## III. DISCUSSION

### A. Insurance Policy Language

Plaintiff's employer, U.S. Air, provided a group life and disability insurance policy through AIG Life Insurance Company. The pertinent policy language provides:

*PERMANENT TOTAL DISABILITY BENEFIT*

> When, within one year after the date of the accident, the insured's injury results in continuous total disability lasting at least 12 consecutive months and at the end of that period the insured is judged by his or her doctor to have a permanent and total disability, we will pay the insured a lump sum permanent total disability benefit. . . .

> "Permanent and Total Disability" means the insured being continuously totally disabled and also, after being under a doctor's regular care and attendance, being judged by that doctor as being unable, solely as a result of such accident, from engaging in any occupation for wage or profit for which he or she is suited by reason of education, training or experience and remaining so unable for the rest of his or her life.

>     .     .     .     .     .

> "Injury" wherever used means bodily injury caused by an accident occurring while the policy is in force as to the Insured Person and resulting directly and independently of all other causes in loss covered by the policy. (Def.'s Ex. B, U.S. Air Policy at 14, 17.)

Thus, to recover under the policy, Plaintiff must show that (1) her disability was the result of an accident; (2) her disability occurred within one year after the accident; and (3) the accident caused her disability, "directly and independently of all other causes." Because Plaintiff contends that her disability began on January 1, 1995, she must show that her disability was directly and independently caused by an accident that occurred on or after January 1, 1994.

### B. Existence of an "Accident"

Plaintiff's application for benefits under the accidental injury insurance policy was filed with Defendant on May 1, 1995. However, the application provides the Court with very little clue as to the nature of the accident which led to Plaintiff's purported injury.[3] (Def.'s Ex. B, Tab 3, Donna Pugh's May 1, 1995 Application for Disability Benefits.) Instead, over the course of this litigation, Plaintiff has suggested a number of possible accident scenarios. Plaintiff initially described the accident as an accidental rupture of her breast implants with a confirmed diagnosis on January 3, 1995. (Def.'s Ex. B, Tab 3, Donna Pugh's May 1, 1995 Application for Disability Benefits.) However, Plaintiff stated in her prepared claim statement that it was "unknown as to how this rupture occurred." (Def.'s Ex. B, Tab 3, Donna Pugh's May 1, 1995 Application for Disability Benefits.) In fact, the rupture of Plaintiff's breast implants was not discovered until the surgery to remove the breast implants was performed by Dr. Truesdale on February 1, 1995. (Def.'s Ex. B, Tab 6, Operative Report of Dr. Truesdale dated February 1, 1995.)

With respect to the description of a qualifying accident,[4] Defendant, and per-

---

3. The Court's discussion of an injury here is only for the purpose of deciding whether an accident took place. The cause of Plaintiff's injury will be discussed as part of the *Reliance Standard* pre-exiting condition analysis.

4. Throughout this Memorandum Opinion, this Court uses the term "qualifying accident" to

mean an accident that occurred within one year prior to the beginning of Plaintiff's total disability on January 1, 1995; that is, the accident must have occurred on or after January 1, 1994. As explained in the previous section, only an accident within this requisite time frame would come within the policy language.

haps Plaintiff, attributed the breast implant rupture to Plaintiff's report to Dr. Burapavong on January 4, 1993 that she fell in a bath tub during a layover in Pittsburgh.[5] (Def.'s Ex. B, Tab 6, Dr. Burapavong's Medical Records for Donna Pugh.) Defendant accepted Plaintiff's description of the fall in the tub as an accident, as indicated by a September 1, 1995 internal memorandum from Claims Examiner Karen Schumel to Bob Gamble which acknowledged that the "insured alleges PTD [permanent total disability] as the result of a fall in a bath tub on approximately 1/4/93 which ruptured her breast implants." (Def.'s Ex. B, Tab 5, Memo from Karen Schumel dated September 1, 1995.) Plaintiff herself had previously confirmed the possibility that the fall in the bath tub was her qualifying accident based upon her June 7, 1995 statement to Defendant in which she referred to the fall in the bath tub in December 1992 or January 1993 as "the only time that I remember which could possibly have affected the implants." (Def.'s Ex. B, Tab 5, Donna Pugh's Written Statement dated June 7, 1995.) Plaintiff, however, asserts that her disability began as of January 1, 1995 because she stopped work on December 30, 1994 and was disabled as of that date. (Def.'s Ex. B, Tab 3, Donna Pugh's May 1, 1995 Application for Disability Benefits.) As noted in the previous section, the policy in this case requires that the disability occur within one year of the date of the accident and that total disability continue for twelve consecutive months. Based upon Plaintiff's initial claim that the December 1992 or January 1993 fall in the tub was the qualifying accident and that her disability began on January 1, 1995, it is obvious that Plaintiff's disability did not occur within one year of the accident. Ac-

cepting a January 1, 1995 date of disability, the disability occurred two years after the accident in the bath tub. Plaintiff's own evidence then would seem to make any further inquiry unnecessary because the accident Plaintiff initially relied upon did not result in a disability within one year of the accident.

Recognizing this result, Plaintiff was left only to speculate as to when and how a qualifying accident took place. Plaintiff herself may have diminished the identification of the 1993 fall as the accident which caused the rupture of her breast implants based upon a statement she made in an interview with Dr. John Goeke of the Pain Management Center. In that December 22, 1994 statement, Plaintiff stated that "she is unclear about any precipitating events or factors which might have influenced the onset of her pain aside from having breast implants in 1986." (Def.'s Ex. B, Tab 10, Psychological Evaluation by John M. Goeke, Ph.D., dated December 22, 1994.) Plaintiff further stated to Dr. Goeke that until having the breast implant surgery, she was generally in good health and led an active life.

Although Plaintiff at this point is claiming that an accident caused her injury as it existed in December 1994, it also appears that Plaintiff is attempting to establish the insertion of the breast implants in 1985 as the cause of her injury.[6] While the causation of Plaintiff's injury is an important matter for discussion under the *Reliance Standard* test, the Court will reserve that topic for later discussion. The Court's inquiry at this point still requires a determination of the nature of the accident which Plaintiff can identify as having caused her injury. Certainly, Plaintiff's statement to Dr. Goeke in December 1994

---

5. Although Dr. Burapavong's records indicate that the fall took place in Pittsburgh, Plaintiff told a claims investigator that the fall took place in Newark, New Jersey. (Def.'s Ex. B, Tab 5, Donna Pugh's Written Statement dated June 7, 1995.)

6. It should be noted that this Court has made no inquiry into the causal link between Plaintiff's breast implants and her fibromyalgia or other physical conditions. Nothing in this opinion should be construed in any way as a finding or conclusion with regard to breast implants themselves. *See infra* footnote 12.

reveals, at least in Plaintiff's mind, that she was unclear and could think of no factors, other than the fall in December 1992 or January 1993, which might have influenced the onset of her pain and the diagnosis of fibromyalgia, aside from having the breast implants in 1985.[7] Obviously, if Plaintiff now attempts to identify the insertion of the breast implants in 1985 as the qualifying accident, and also designate January 1, 1995 as the date of her disability, then Plaintiff's implicit use of the insertion of breast implants as the accident clearly puts the January 1, 1995 date of disability beyond one year of the accident.[8] If this were true, the Court would have to find that Defendant correctly denied Plaintiff's claim for coverage based upon all of the information submitted to Defendant as part of Plaintiff's application for benefits.

Pressed to present a theory as to the existence of a qualifying accident, Plaintiff's former attorney, Mr. Randolph James, made an effort to do so in his letter of appeal of Defendant's denial of Plaintiff's claim. Mr. James offered an explanation which attempted to close the gap between the date of disability and an event which would qualify as an accident under the policy language. Specifically, Mr. James stated in his letter that:

1. The symptoms and conditions of my client were not manifested or exhibited until January 19, 1995 when she noticed leakage from the breast implants. The leakage was not a result of trauma sustained from a fall in the shower which my client reported on approximately December 1992 or early January 1993. The leakage itself is a covered cause resulting in coverage. (Def.'s Ex. B, Tab 3, Letter from Randolph James dated November 2, 1995.)

The Court viewed Mr. James' letter as a recognition that the initial report of Plaintiff's fall in the bath tub in December 1992 or January 1993 would be problematic to the extent that Plaintiff's claim of disability did not occur until January 1, 1995, well beyond one year after the accident. Mr. James' statement that the leakage did not manifest itself until January 19, 1995 does not resolve the question of the relationship between the occurrence of an accident and the onset of the disability. Practically speaking, Mr. James' explanation would have the date of the disability, January 1, 1995, occurring *prior* to the leakage on January 19, 1995. The Court notes, however, that Mr. James seems to identify the leakage not as an accident, but as a covered event in and of itself. However, other than to identify all events as qualifying accidents, neither Plaintiff nor Defendant has directed the Court to any other basis to support Plaintiff's application for coverage other than the accidental injury provision of the policy. Therefore, the Court can only view Mr. James' reference as an assertion that the manifestation of the leakage on January 19, 1995 was a qualifying accident which resulted in an injury leading to a total disability. However, this Court finds no merit in the theory that an accident which occurred on January 19, 1995 could have caused a disability which began three weeks earlier. It is not reasonable to conclude that the disability began before the accident occurred. Therefore, this Court does not accept the purported leakage in January 1995 as a qualifying accident.

Notwithstanding the efforts of Plaintiff and Mr. James to identify an accident which occurred one year prior to Plaintiff's January 1, 1995 date of disability, Defendant notified Plaintiff on September 19,

---

7. Plaintiff occasionally refers to her breast implant surgery as occurring in 1986, and several of her doctors make a similar reference. However, her records indicate that this surgery actually occurred in 1985. (Def.'s Ex. B, Tab 6, Dr. Burapavong's Medical Records for Donna Pugh.) This Court will use

1985 as the year of the implant surgery, although the exact date is irrelevant in the present action.

8. This Court makes no finding as to whether insertion of the breast implants could even be considered an accident at all.

1995 that following the investigation, Plaintiff's application for benefits was denied for reasons unrelated to the inquiry as to whether an accident had or had not taken place.[9] (Def.'s Ex. B, Tab 5, Letter from Karen Schumel dated September 19, 1995.) The question still remains for the Court as to whether Plaintiff's disability was preceded by an accident within one year. Based on the evidence presented up to this point, the Court is obliged to find that no qualifying accident occurred.

Understanding the importance of this question, Plaintiff suggested an additional event which Plaintiff contends would qualify as an accident within the language of the policy. In a Supplement to Plaintiff's Response to Defendants' Motion for Summary Judgment, Plaintiff stated the following:

> The plaintiff had a mammogram in 1988, there was no evidence of rupture. The records of Dr. David T. Burapavong, who performed the implant surgery on the plaintiff, indicate the implants to be intact in 1993. A mammogram in October 1994 indicate the implants to be intact. The Plaintiff had the implants removed in February 1995 and were found to be ruptured. This would indicate the rupture (accident) to have occurred in the acceptable time frame set forth in the policy. During the period between the October 1994 mammogram and the surgery to remove the implants, the plaintiff began to have leakage of fluid from her nipples and noticed a distinct decrease in size with some drooping. These are known symptoms

of rupture. (Supplement to Pl.'s Resp. to Def.'s Mot. for Summ. J. at 2.)

Based upon this argument, Plaintiff reaches the conclusion in her Trial Brief that "[g]iven the time of the mammogram and the manifestation of symptoms it is highly probable the mammogram of October 1994 was the cause of the rupture. Thus the accident would have occurred in the appropriate time frame stipulated by the policy." (Pl.'s Trial Br. at 3.) After several attempts by Plaintiff to identify an accident which resulted in a disability within one year after the date of the accident, Plaintiff has sifted the events down to reflect October 1994 as the date of an accident when, as she claims, there is a high probability that the mammogram itself caused the rupture of her breast implants as manifested by leakage and drooping of her breast shortly after the mammogram. However, even if the Court assumes, arguendo, that Plaintiff has correctly identified the October 1994 mammogram as the accidental cause of the rupture of Plaintiff's breast implants, in order for Plaintiff to prevail the Court must still find that the onset of Plaintiff's disability on January 1, 1995 was caused directly and independently by the October 1994 rupture.[10]

### C. Independent and Direct Causation Under the *Reliance Standard* Test

To recover for her disability, Plaintiff must show that she was disabled "solely as a result of [the] accident." (Def.'s Ex. B, U.S. Air Policy at 17.) The policy defines injury as a "bodily injury caused by an accident occurring while the policy is in force as to the Insured Person and result-

---

**9.** Again, as will be discussed, the denial of benefits was because of a determination that Plaintiff's claim of injury and resulting disability were related to a pre-existing condition and not because of the presence or absence of an accident.

**10.** This Court notes that the October 1994 mammogram was not presented to the Plan Administrator as a possible accident which could have caused Plaintiff's injury. This Court has strong reservations about considering a theory of injury not even raised before

the Plan Administrator. However, in this case even if the October 1994 mammogram is accepted as an accidental injury, Plaintiff has presented insufficient evidence that her disability was caused directly and independently by that accident, as will be discussed. Therefore, for the sake of a full discussion and a full review of the pre-existing nature of Plaintiff's conditions, this Court will continue its review of the decision based on the assumption that an accidental injury occurred in October 1994.

*ing directly and independently of all other causes in loss covered by the policy."* (Def.'s Ex. B, U.S. Air Policy at 14.) Defendant argues that Plaintiff's illness is a "pre-existing condition," and that as a result, she has failed to show that her injury and disability were the direct and independent result of a qualifying accident.

■ The resolution of Defendants' Motion for Summary Judgment must then turn to a consideration of the analysis the Fourth Circuit Court of Appeals has provided for district courts to use for review of ERISA cases where there is an issue of pre-existing conditions.[11] In *Quesinberry,* the Fourth Circuit held that courts should use the analysis applied by the Court in *Reliance Standard* in addressing "whether a particular loss was covered under an ERISA-governed accidental injury insurance policy." *Quesinberry,* 987 F.2d at 1028. The "test requires a two-step determination: first, whether there is a pre-existing disease, pre-disposition, or susceptibility to injury; and, second, whether this pre-existing condition, pre-disposition, or susceptibility *substantially contributed to the disability or loss." Id.* (emphasis added.)

Before beginning this analysis, this Court must identify the injury or condition

that caused Plaintiff's disability. Having assumed, arguendo, that Plaintiff had an accident based upon the October 1994 rupture of her breast implants, Plaintiff's resulting injury which caused her disability also must be identified. Plaintiff contends that her disability is caused by (1) fibromyalgia, fatigue, and other painful physical conditions; and (2) depression and mental disorders. Each of these two injuries must be considered under the two-step *Reliance Standard* test to determine if the purported October 1994 rupture was the direct and independent cause of an injury that resulted in her disability.

### 1. Fibromyalgia and Fatigue

■ All indications from Plaintiff's medical records as of the filing of her application for benefits are that her injury or disabling condition was fibromyalgia. In fact, it was Dr. Grace Terrell ("Dr. Terrell") who first rendered a diagnosis based upon the symptoms Plaintiff presented to Dr. Terrell. In her visit to Dr. Terrell in September 1994, Plaintiff completed a form for Assessment of Possible Silicone Breast Implant Related Illness in which Plaintiff indicated that the history of her present illness began around 1985 and that it was getting worse.[12] Plaintiff's com-

---

**11.** Before making the assumption that the October 1994 mammogram was the qualifying accident under the policy, the Court went to great lengths to explore Plaintiff's efforts to identify an accident within one year of the disability date of January 1, 1995. Up to October 1994, the Court could find no qualifying accident. Defendant reached the same point more quickly by accepting for sake of argument that Plaintiff's report of a fall in the bath tub in December 1992 or January 1993 was the accident which caused the rupture of Plaintiff's breast implants and led to the diagnosis of fibromyalgia. The Court, however, determined that development of the accident identification was necessary to the ultimate determination of (a) whether Plaintiff sustained an accidental injury and resulting disability, (b) whether there was a pre-existing condition, and (c) if so, whether the pre-existing condition substantially contributed to Plaintiff's disability. Defendant denied coverage for Plaintiff's claim of disability on the

basis of (b) and (c). Based on the assumption that Plaintiff's October 1994 mammogram accidentally caused her breast implants to rupture, the Court will undertake a discussion of whether Defendant's decision as to (b) and (c) was appropriate.

**12.** Throughout this discussion, the Court will discuss Plaintiff's statements that her problems began after her breast implant surgery in 1985. These statements are important in the present case for a determination of whether Plaintiff's condition existed prior to October 1994. However, this Court has not made any inquiry or findings into the relationship between the implants and Plaintiff's illness. Nothing in this Memorandum Opinion should be construed as affecting the inquiry underway as part of the national litigation surrounding breast implants. This Court notes that Plaintiff has been pursuing two separate avenues of recovery: the present claim against AIG for disability resulting directly

plaints included the following responses to questions directed to her.

> [F]atigue? (Inclination to rest even though pain and weakness are not limiting factors; may be prominent even when the patient has not been physically active; have there been more "bad" than "good" days?)
>
> Answer: Always, All bad days
>
> [P]oor sleep? ("do you usually feel ready to face the day on awakening?")
>
> Answer: Do not sleep more than one hour then wake. Start the day tired.
>
> [W]eight loss or weight gain?
>
> Answer: 65 lbs.
>
> Loss of appetite?
>
> Answer: No
>
> [H]eadaches?
>
> Answer: Yes, everyday
>
> [D]epression?
>
> Answer: Yes
>
> [O]ther?
>
> Answer: Muscle & joint aches (Def.'s Ex. B, Tab 8, Assessment of Possible Silicone Breast Implant Related Illness, completed by Donna Pugh for Dr. Terrell.)

Dr. Terrell's summary of her examination indicated that Plaintiff's medical history also included bilateral breast implants. Dr. Terrell further noted that Plaintiff

> states that over the past several years she has increasing difficulty with sleeping in which she wakes up every hour and looks at the clock, problems with the restless legs syndrome at night, decreased memory, and a 65 lb. weight gain since her implants. She complains of severe musculoskeletal pain with multiple arthralgias and myalgias. She states that she takes 2 to 3 hot baths a night every night just to get through the night and has previously been prescribed muscle relaxers and Xanax for

her muscular pain. Evaluation of medical records from Dr. Peter's practice reveal a history of recurrent abdominal pain, lower chest pain, migraine and tension headaches, bronchitis, sinusitis, rectal bleeding with external hemorrhoids, and chronic muscle spasms of the shoulder, leg and thigh. *The patient states that most of these symptoms were not present prior to her breast implants in 1985.* (emphasis added) (Def.'s Ex. B, Tab 8, Dr. Terrell's letter to Attorney Terrell dated October 11, 1994.)

Defendant argues in its Motion for Summary Judgment that, based upon the symptoms and medical history Plaintiff presented to Dr. Terrell in September 1994, Plaintiff would not be entitled to coverage under the accidental insurance policy because Plaintiff had a pre-existing condition. Defendant offers proof to the Court that Plaintiff's ultimate diagnosis of fibromyalgia was based upon the same symptoms Plaintiff had previously experienced beginning in 1985 after the implant surgery. In addition, the diagnosis and resulting disability were based on symptoms reported to Dr. Terrell in September 1994, before the purported October 1994 rupture. Defendant further argues that because Plaintiff previously experienced and sought treatment for the same symptoms which she now has disclosed to Dr. Terrell and others, such prior symptoms represent a pre-existing condition, whether such condition had been previously labeled or diagnosed as such or not. *See Marshall v. UNUM Life Ins. Co.*, 13 F.3d 282 (8th Cir.1994) (concluding that where a plaintiff experienced and sought treatment for fatigue and myalgia, which were symptoms of her disabling illness, during the period prior to coverage, her chronic fatigue disability was a pre-existing condition); *Par-*

---

from an accidental injury, and her claim as part of the Breast Implant Litigation Settlement. In pursuing her breast implant claim, she attributed her illness to the implants themselves, not to a later accident. The Court's analysis of plaintiff's case is limited to a determination of whether an accidental injury took place which directly caused her disability. The Court does not intend for this Memorandum Opinion to demonstrate or recognize a causal link between the breast implant itself and Plaintiff's disability.

*ker v. UNUM Life Ins. Co.*, 930 F.Supp. 1343 (D.Ariz.1996) (holding that plaintiff's chronic fatigue syndrome was a pre-existing condition where she complained of and sought treatment for fatigue and sleeplessness prior to coverage); *Fath v. UNUM Life Insurance Co.*, 928 F.Supp. 1147 (M.D.Fla.1996) (summary judgment allowed for insurer where insured experienced symptoms of then-undiagnosed fibromyalgia prior to coverage).

Specifically, Defendant denied Plaintiff's claim after a review of Plaintiff's medical history as provided by Dr. Terrell, Dr. Scott Stewart, Dr. David T. Burapavong, Dr. Gerald Truesdale, and others. With respect to the history provided by the medical providers, Defendant offers the following as examples of the pre-existing nature of Plaintiff's present claim of disability:

(1) Dr. Terrell in her deposition responded to questions of counsel in the following manner:

Q. So she has exactly the same thing today she had when she came to first see you in September of 1994?

A. Uh-huh.

Q. And those symptoms and those illnesses had existed, to your knowledge and from your interview with her and viewing other medical records, for a number of years prior to that time?

A. That's correct. (Def.'s Ex. C, Dr. Terrell's Dep. at 68.)

(2) Defendant also presented as a part of their Motion for Summary Judgment Dr. Terrell's Attending Physician's Statement dated May 9, 1995 which reveals that Plaintiff's symptoms were chronic and appeared over the past five years. The statement also indicates that Plaintiff ceased to work on December 30, 1994, as a result of her condition. (Def.'s Ex. B, Tab 4, Attending Physician's Statement of Dr. Terrell dated May 9, 1995.)

(3) "The patient complains of multi-focal pain which had its onset approximately eight to nine years ago. The patient states that she is unclear about any precipitating events or factors which might have influenced the onset of her pain aside from having breast implants in 1986." (Def.'s Ex. B, Tab 10, Psychological Evaluation by John M. Goeke, Ph.D. dated December 22, 1994, at 1.)

(4) "The patient is a 45–year old female complaining of generalized body aches and pains over the last several years. There is no set date of injury. She reports that over the last eight years there has been a gradual increase in general body malaise. She does report that her status-post her bilateral breast implants, her fatigue and body aches have increased. She does not currently implicate the breast implants as the causal factor." (Def.'s Ex. B, Tab 11, Medical Evaluation by Dr. Anthony Russell dated December 22, 1994, at 1.)

These references are but a sample of the medical reports offered by Defendant. The central theme that runs through all of the reports is that the symptoms which formed the basis of Dr. Terrell's diagnosis of Plaintiff's disability as fibromyalgia in September 1994 are the same symptoms that Plaintiff reported as beginning shortly after her breast implants in 1985, and are symptoms for which Plaintiff had previously sought treatment from Dr. Peters, as noted by Dr. Terrell. (Def.'s Ex. B, Tab 8, Dr. Terrell's letter to Attorney Terrell dated October 11, 1994; *see supra* page 17.)

In addition, Defendant's assertions are supported by two statements that are attributed to Plaintiff as part of claims she filed either as a part of the present claim or as a part of her claim in the Breast Implant Litigation Settlement. In Plaintiff's statement to Defendant, Plaintiff stated that

[s]hortly after the implant I began experiencing pain in breasts [sic] and the

implants were hard. I went back to the doctor and was told there was nothing wrong. All that was needed was a capsulectomy which he performed. Three additional capsulectomies were performed over the following years. I began experiencing flu like symptoms. I would ache all over. My joints would hurt and knots would come up on my back. Hot baths would temporarily relieve some of the pain. (Def.'s Ex. B, Tab 5, Donna Pugh's Written Statement dated June 7, 1995).

Plaintiff's second statement submitted as part of the Breast Implant Litigation Settlement included the following summary:

As soon as she had her implants, she began having problems with pain, soreness and fatigue. But because she had just started a job as a flight attendant with U.S. Air, she thought for years that her health problems were job related. Her many physical activities suddenly came to a halt. She developed severe and chronic pain in her joints, back, and muscles. She felt tired and depressed. Also, for the first time in her life, she was unable to sleep at night, primarily because of the constant pain. (Def.'s Ex. E, Breast Implant Litigation Claim Form.)

Plaintiff's statements, as well as the numerous references to Plaintiff's medical history, lead the Court to the conclusion that the symptoms which Plaintiff reported to Dr. Terrell in September 1994 originated, as Plaintiff herself stated, "shortly after the implant." This Court notes again that Plaintiff's evaluation and diagnosis by Dr. Terrell occurred in late September 1994, prior to the purported rupture in October 1994. In addition, Plaintiff experienced the same symptoms and sought treatment for these symptoms beginning in the late 1980s. The Court, therefore, finds that Plaintiff suffered from a pre-existing condition which existed and was

diagnosed prior to the purported October 1994 accidental injury.

Having completed the first step of the *Reliance Standard* analysis and determined that Plaintiff's pain and fatigue were pre-existing conditions, this Court must then move to the second step of the *Reliance Standard* analysis to determine if the pre-existing conditions substantially contributed to Plaintiff's disability. In this case, Plaintiff has presented no evidence that the October 1994 rupture, which the Court accepted as a qualifying accident for the sake of further analysis, was the direct cause of her illness. The illness had been ongoing since 1985, and had been evaluated by Dr. Terrell a few weeks before the purported October 1994 rupture. Thus, Plaintiff fails to establish any sufficient causal link between the purported October 1994 accident and her disabling illness. Even if Plaintiff's condition may have been worsened by the purported October 1994 rupture, this Court finds that Plaintiff's pre-existing fatigue and muscle pain substantially contributed to her overall disability. Under the *Reliance Standard* test, this Court therefore concludes that Plaintiff's disabling fibromyalgia and fatigue were not directly and independently caused by the purported October 1994 accidental injury so as to meet the requirement for coverage under the accidental insurance policy. Plaintiff has therefore failed to present sufficient evidence to create a genuine issue of material fact in any of her responses to Defendants' Motion for Summary Judgment.

### 2. Depression and Mental Disorder

■ Recognizing the real possibility that her symptoms, which began in 1985 and led to the diagnosis of fibromyalgia, may be considered by the Court as a pre-existing condition, Plaintiff has only recently asserted the claim that her disability was caused by her depression and mental disorder and not by her physical ailments.[13] (Pl.'s Reply Br. and Supp.

---

**13.** Notably, Plaintiff's claims to the Plan Administrator did not assert that her disability

was due to her mental disorder. However, as noted previously, this Court will review the

Aff. at 3–5.) Once again, this Court will use the *Reliance Standard* framework to evaluate this claim. First, it is clear from the evidence that Plaintiff was suffering from depression during the period from 1985–1994. It appears that this depression was ongoing and was linked to Plaintiff's physical pain, sleeplessness, and fatigue. Several pieces of evidence support this conclusion:

1. Plaintiff's own statement as part of her claim in the Breast Implant Litigation Settlement:

"*As soon as she had her implants,* she began having problems with pain, soreness and fatigue.... She developed severe and chronic pain in the joints, back and muscles. *She felt tired and depressed* ..... The woman who was once a cheerful, active, and hardworking [sic] has become *borderline suicidal as a result of her pain and depression.*" (emphasis added) (Def.'s Ex. E, Breast Implant Litigation Claim Form.)

2. Evaluation by Dr. Goeke:

"The patient complains of multi-focal pain which had its onset approximately eight to nine years ago.... *On the Clinical Scales the patient obtains a profile type commonly found among person diagnosed with major depressive disorders accompanied by anxiety and strong somatic over-focus.* This is a commonly occurring profile in patients diagnosed with chronic pain syndromes who are essentially experiencing an emotional crisis." (emphasis added) (Def.'s Ex. B, Tab 10, Psychological Evaluation by John M. Goeke, Ph.D. dated December 22, 1994, at 1,5.)

3. Records of Dr. Scott Stewart:

"She was well until 1985 when she had breast implants done. As soon as this was done she felt like she had influenza and has felt bad ever since.... *She has progressively gotten worse over the course of the last ten years.... In addi-*

*tion she has significant depression.* I think she has good reason to be depressed, but that is not a good excuse.... Presuming that we get good adequate levels of Doxepin in her system and we are still not getting good response of her depression, then I think that this particular symptom, although it may be reactive in origin, is certainly causing her enough distress that seeing a psychiatrist would be of benefit to her." (emphasis added) (Def.'s Ex. B, Tab 7, Evaluation by Dr. Stewart dated March 28, 1995.)

Plaintiff's depression was noted by Dr. Terrell in September 1994 before the purported October 1994 qualifying accident, and Dr. Terrell noted that although Plaintiff's daily condition fluctuates, Dr. Terrell's diagnosis has not changed:

Q. There's nothing in your records that indicates to you that Ms. Pugh suffers today from anything that she didn't suffer from when she came into your office on September the 27th, 1994, is there?

A. No. Her depression has worsened at times.

Q. I didn't ask you if it had gotten worse?

A. No. She—*I have not made a new diagnosis.*

Q. So she has exactly the same thing today she had when she came to first see you in September of 1994?

A. Uh-huh.

. . . . .

Q. When you used the term "waxed and waned," you mean go up and down, she's better sometimes and worse sometimes?

A. Yes. She's better sometimes and worse sometimes.

Q. And that's prevailed since the first day she came to your office, hasn't it?

---

evidence that Plaintiff has presented in order to show that she has presented insufficient evidence to create a genuine issue of material fact as to her coverage under the plan, even if this evidence had been presented to the Plan Administrator.

A. Yeah.

. . . . .

A. She's—she never—she would never—she has never told me she felt good, ever, ever. She has, obviously, at times been just in extreme emotional distress over her symptoms. Objectively, she's about the same, you know, physically all the time. . . . (emphasis added) (Def.'s Ex. C, Dr. Terrell's Dep. at 67–68, 72–73.)

As Dr. Terrell indicated, her recognition of Plaintiff's depression was not a new diagnosis of Plaintiff's mental condition. The same is true as to the evidence Plaintiff has presented from Dr. John Warren to establish a disability based on Plaintiff's claims of a mental disorder. Dr. Warren noted that Plaintiff's mental disorder has been ongoing:

Ms. Pugh stated that her difficulties in retrospect started a few years ago when she had cosmetic breast implants. . . . She reported that she had been out sick quite often and that her supervisor had suggested that in 1994 that she needed to do something to deal with her frequent use of sick time. *She said that she has been continually depressed since that time. . . .*

. . . . .

*Overall, Ms. Pugh appears to have a significant level of psychological dysfunction. It appears to have been present for a couple of years.* There are also a number of factors before that time in her life that indicate that her *emotional dysfunction was present prior to that time. . . . Her physical problems with the breast implant and Fibromyalgia during the past few years sound as if they have been depressing.* (emphasis added) (Def.'s Ex. F, Summary of Psychological Evaluation by Dr. Warren at 1, 7.)

Therefore, like the physical symptoms of plaintiff's condition which led to the diagnosis of fibromyalgia, this Court finds that Plaintiff's depression was a pre-existing condition.

Plaintiff has presented three additional affidavits in an attempt to show that her mental disorder was not a pre-existing condition. In a March 30, 1998 affidavit, Dr. Goeke stated that Plaintiff's depression and anxiety were manifested in close proximity to the time of his December 22, 1994 evaluation of Plaintiff. (Pl.'s Rep. and Supp. Aff., Ex. C.) He also stated that Plaintiff's theory that the "rupture and subsequent surgery" caused her psychological disorders was "highly viable." However, Dr. Goeke did not state that a causal link existed, nor did he explain his earlier statements that Plaintiff's depression and "emotional crisis" were caused by her "chronic pain" which "had its onset approximately eight to nine years ago." (Def.'s Ex. B, Tab 10, Psychological Evaluation by John M. Goeke, Ph.D., dated December 22, 1994, at 1, 5.) Plaintiff presents a March 30, 1998 affidavit from Dr. Warren, in which Dr. Warren states only that "Ms. Pugh's psychological symptoms worsened to the point of disability at about the time when she was experiencing problems related to her breast implant rupture and subsequent explantation surgery." (Pl.'s Mot. to Delay Hr'g on Def.'s Mot. for Summ. J., Ex. B.) However, Dr. Warren's statement implies that Plaintiff's psychological symptoms existed prior to that time, and only worsened after the rupture and surgery. In addition, he does not state that her mental disorder was caused directly by the purported October 1994 accidental rupture. Finally, Dr. Terrell's March 3, 1998 affidavit states that Plaintiff's psychological disorders "were manifest after her breast implant rupture and subsequent explantation surgery." (Pl.'s Mot. to Delay Hr'g on Def.'s Mot. for Summ. J., Ex. A.) This Court considered all of this evidence, but concluded that there was insufficient evidence that the rupture caused Plaintiff's psychological disorder, especially in light of the overwhelming evidence that her depression existed prior to October 1994.

Having concluded that Plaintiff had a pre-existing mental disorder, this Court must move to the second step of the *Reliance Standard* test to determine whether that pre-existing condition substantially caused Plaintiff's current allegation of a disability consisting of a mental disorder. As to both Dr. Terrell and Dr. Warren, Plaintiff contends that the evidence establishes that her mental disorder has gotten worse, and that the disorder was directly caused by the purported October 1994 rupture. Even if this Court accepted this statement as a sufficient causal link between the purported October 1994 rupture and the Plaintiff's depression, despite the lack of supporting evidence, the Court is nonetheless compelled to conclude that Plaintiff's pre-existing depression and symptoms of fibromyalgia substantially contributed to any mental disorder which she now suffers from. This Court views Plaintiff's claim of disability due to mental disorder as an attempt to create an alternative disabling condition in order to avoid the consequences of her inability to establish evidence of a disability that was directly and independently caused by a qualifying accident.

It is clear to this Court that Plaintiff is suffering from depression and painful physical ailments. These conditions have caused her ultimate inability to work. However, the insurance plan put in place by Defendant for U.S. Air was not a comprehensive, general disability plan. Instead, the disability plan provided by Defendant was an accidental injury policy which only provided for compensation for disability that resulted within one year after an accident. After a thorough review of the evidence, this Court finds that Plaintiff has failed to show that she meets the requisite criteria for coverage under the accidental injury insurance policy. Therefore, while sympathetic to Plaintiff's suffering, this Court is compelled to find that she has not presented sufficient evidence to survive Defendants' Motion for Summary Judgment. Defendants' Motion for Summary Judgment is therefore GRANTED.

## IV. CONCLUSION

Defendants have presented substantial evidence that Plaintiff Donna Pugh's disabling illness was the result of a pre-existing condition and was not caused directly and independently by any qualifying accident. In light of this evidence, Plaintiff Donna Pugh has failed to present sufficient evidence to create a genuine issue of material fact regarding coverage of her disability under Defendant AIG Life Insurance Company's insurance policy, and Defendants are entitled to judgment as a matter of law. Therefore, Defendants' Motion for Summary Judgment as to all claims brought by Plaintiff Donna Pugh [Document # 45] is GRANTED and all of Plaintiff's claims are hereby DISMISSED.